## WYATT v. SHACKLEFORD et al.

No. 9821—Opinion Filed Oct. 12, 1920.

Rehearing Denied Nov. 23, 1920.

(Syllabus by the Court.)

1. **Appeal and Error—Review of Equity Case—Findings—Evidence.**

In an equity case, where the trial court has made findings of fact, the same will not be set aside in this court unless the findings of the trial court are clearly against the weight of the evidence.

2. **Same—Action to Recover Certificates of Stock—Fraud by Purchaser.**

From an examination of the entire record, held, the findings of the trial court are not clearly against the weight of the evidence.

Error from District Court, Tulsa County; M. A. Breckenridge, Judge.

Action by J. C. Wyatt against W. H. Shackleford and others to recover certificates of corporate stock. Judgment for defendants, and plaintiff brings error. Affirmed.

H. B. Martin and J. D. Harris, for plaintiff in error.

Davidson & Williams, for defendants in error.

McNEILL, J. This action was commenced in the superior court of Tulsa county by J. C. Wyatt, against W. H. Shackleford, E. E. Dix, the Dixford Oil & Gas Company, a corporation, and the Sinai Oil & Gas Company, a corporation, to recover possession of cer-

tain certificates of stock in said corporations which plaintiff transferred to Shackleford.

The petition is very lengthy, and may be summarized as follows: It is alleged that the Dixford Oil & Gas Company and the Siani Oil & Gas Company are Oklahoma corporations; W. H. Shackleford being president, and E. E. Dix secretary and treasurer; the board of directors consisting of Shackleford, Dix, and Mr. Belford. That the plaintiff was the owner of certain shares of stock in said corporations, and said Shackleford and Dix, by certain false and fraudulent representations, induced said plaintiff to sell and transfer his shares of stock in each of said corporations for a very inadequate consideration to Shackleford. It is alleged the plaintiff had known said Shackleford and Dix for many years, and was engaged in many other business transactions with them, and had explicit confidence in their integrity, and, relying upon their representations, sold his stock to Shackleford without knowing the true condition of affairs of the company, which had been concealed from him by Shackleford and Dix, they falsely representing the true financial conditions of the companies. It is further alleged that at the time of purchasing plaintiff's stock the defendants were selling an oil and gas lease belonging to the corporation to a Mr. Bradstreet for a large sum of money, and they failed to disclose this fact to the plaintiff, but concealed the same from him.

The defendants answered that at the time of the sale referred to the two corporations together owed debts amounting to about eighteen thousand ($18,000.00) dollars, and they deny there were any false or fraudulent representations made by them, and deny that any facts concerning the financial standing of the corporations were concealed by them from plaintiff.

The defendant Shackleford, by way of cross-petition, alleges he entered into a written contract with Wyatt for the purchase of the stock for the consideration of four thousand ($4,000.00) dollars, and as a further consideration guaranteed the payment of a note in the sum of forty-eight hundred ($4,800.00) dollars, as one-third of said note was owed by the plaintiff, Wyatt, and further guaranteed to pay some ten thousand ($10,000.00) dollars indebtedness owed by Dix to a bank that Mr. Wyatt was interested in, and for which amount he was liable, and to assume the payments of all the corporations' indebtedness; that the written contract provided that the four thousand ($4,000.00) dollars should be paid on or before the 19th day of February, 1917, and that the other payments should be made later, and that, in addition to the stock, plaintiff

agreed to sell one-third interest in eighty (80) acres of land, the other two-thirds interest being owned by Shackleford and Dix; that Wyatt failed and refused to make said transfer; and defendant prayed for specific performance of said contract, requiring said plaintiff to execute said deed to said land. Upon trial of the case, the court made certain findings of fact, to wit: The court found that said written contract was made and entered into without any fraud, misrepresentation, or concealment on the part of said Shackleford or Dix, or either of them; the court further found as a fact that the said Shackleford had complied in every respect with the terms and conditions of said contract. The court then found that the defendants W. H. Shackleford and E. E. Dix are now the owners of the capital oil stock of the Dixford Oil & Gas Company and Sinai Oil & Gas Company transferred to Shackleford by Wyatt. The court found that the said W. H. Shackleford, having complied with all the terms and conditions of said contract, is the owner of the undivided one-third interest in the eighty (80) acres of land in the name of Wyatt, and required plaintiff to execute a conveyance for the same. From said judgment, plaintiff has appealed.

The plaintiff in error's counsel, in their argument for reversal, announced the following rule:

"An officer of a corporation occupies a position of trust with reference to a stockholder in the corporation, from whom he seeks to buy such shareholder's stock therein, and upon undertaking such enterprise, it becomes his duty to reveal to the vendor all the information which he has in reference to the value of the stock which he seeks to purchase, and any fact bearing upon the situation which should be known by the vendor in order to make a fair disposition of his stock holdings. And the courts uniformly hold that an officer's failure to impart such knowledge to the stockholder is a fraud upon the latter's rights"
—and cite numerous authorities in support thereof.

Admitting that the above is the correct rule, and applicable to the facts in the case at bar, we are then confronted with the question, Did Mr. Shackleford and Mr. Dix make a complete disclosure of the true conditions of the company at the time of the sale? The rule is well established in this court that in an equity case findings of fact of the trial court will not be disturbed on appeal, unless clearly against the weight of the evidence. Let us examine the record to ascertain if the findings of the trial court are clearly against the weight of the evidence. Both companies were oil corporations and

owned certain oil and gas leases in Okmulgee county. The case was tried and is briefed as if the holdings of the companies were joint and commingled together as one company, and we will so treat it here. The evidence disclosed that, at the time of the sale from Wyatt to Shackleford, there were two oil wells on the leases of the companies, one of which was drilled in July, 1916, and one in December, 1916; that these wells made 100 barrels or more of oil when first drilled in, and did for some time thereafter. At the time the wells were first drilled in, it was believed the property was of great value. There was also a gas well drilled on the lease some time in September, but the gas was not utilized from said well for the reason there was no sale for the same, and in the latter part of January, 1917, the third well was completed, and it was a dry hole.

On the 18th day of January, 1917, the Prairie Oil & Gas Company refused to run the oil from the lease for the reason the oil was known as cut oil. At that time the lease was making about 125 or 150 barrels of cut oil per day. As to the cause of the wells producing cut oil, the record is not clear whether it was caused by the salt water and gas in the wells, or was caused by the condition of the cups in the pump. Mr. Dix, who had charge of and who was managing the development of the leases, used different methods to treat the oil, but had no success until February 20, 1917. About the middle of January, the parties made a contract of sale of an eighty (80) acre tract, or lease, to Mr. Bradstreet, for ten thousand ($10,000.00) dollars, of which seven thousand five hundred ($7,500.00) dollars was cash, and the balance, two thousand five hundred ($2,500.00) dollars, to be paid out of the first oil to be run.

About the time of sale, February 14, 1917, the companies were indebted about eighteen thousand ($18,000.00) dollars, and were not running any oil, and were unable to sell any; their bills were due and payable. On January 30th, Mr. Shackleford appeared at Carthage, Mo., where Mr. Wyatt lived, and had a conversation with him regarding the conditions of the companies, and their leases, and also talked about some mining property they were interested in in Missouri. The parties do not agree upon what was said in this conversation. On the 8th day of February, 1917, Mr. Wyatt came to Tulsa, Oklahoma, at the request of Dix, and went out to the lease with Mr. Dix. Mr. Shackleford was at Tulsa, but did not make the trip to the leases. On that day no oil was being run, and the men in charge of the lease were attempting to treat the oil, but had been unable to make a success out of the same, and

while at the lease some bills were presented to Mr. Dix. Mr. Dix and Mr. Wyatt returned to Tulsa, and were apparently blue as to the future outlook, and talked to Shackleford as to what was best to be done. The parties do not agree upon the conversation that took place; Mr. Wyatt detailing one story, and Mr. Dix and Mr. Shackleford another. These three parties were interested in a mine in Joplin, Mo., which was being operated by Mr. Wyatt. Mr. Shackleford and Mr. Dix had been sending money to help develop that property. Mr. Dix and Mr. Shackleford now contend that they were guaranteeing all of the bills for the oil company, and that Mr. Wyatt was not putting up his share. During the course of their stay at Tulsa, a proposition was made regarding Mr. Wyatt selling his stock to Mr. Shackleford, but Mr. Wyatt said he would consider the matter after he got home, and he was then to notify Mr. Shackleford. The parties do not agree upon what was said concerning the transaction at Tulsa, but no sale was consummated at that time. It was contended that Wyatt stated he would go back to Carthage and then would advise Mr. Shackleford as to the terms he would sell on. Mr. Shackleford contended that he told Mr. Wyatt that he could not handle the proposition of buying his stock unless given time to enable him to go to Kansas City to take it up with some friends, to see about raising the money. The parties separated at Tulsa; Wyatt going to Carthage, Shackleford to his home in Kansas City, and Dix remaining in Tulsa. Mr. Dix was a witness at Clinton, Mo., on the 14th day of February, and this fact became known to Mr. Wyatt, and Mr. Wyatt called Mr. Shackleford at Kansas City, requesting that he come to Clinton and they would again talk over the proposition of the sale of the property. The parties met at Clinton, and after talking over the situation a written contract was entered into, whereby Wyatt was to sell his shares of stock in both companies to Mr. Shackleford, and his one-third interest in eighty (80) acres of land in Okmulgee county, for the consideration mentioned in the written contract, and heretofore referred to. It is contended by plaintiff in error that, at the time of sale, Mr. Dix had knowledge of certain chemicals that could be used in treating the cut oil to make it merchantable, and that he withheld this from Mr. Wyatt. It is contended, and admitted, that the use of the chemical was afterwards a success. Mr. Wyatt contends that if he had been informed of this fact, he would not have sold.

The evidence upon this question discloses that Mr. Dix treated the oil every way recommended by different persons, but without

results, and was later informed that there was a chemical known as Treatolite which would clear the oil and make it merchantable. Mr. Dix testifies that he first learned of Treatolite on the 6th day of February, and wrote to the company at St. Louis regarding same, but heard nothing from them. On the 13th day of February, he met a representative of the company at the Tulsa Hotel and ordered six drums of Treatolite. The agent advised Mr. Dix that if the chemical was not a success, he would not have to pay for it; otherwise, it would cost one hundred ($100.00) dollars per drum. The parties disagree as to what Mr. Dix said to Mr. Wyatt concerning Treatolite, and about the same being guaranteed. It appears that Treatolite was a new process for treating oil, and had been used but very little in that vicinity. This chemical was not used until the 20th day of February. Mr. Shackleford, on the 19th day of February, paid four thousand ($4,000.00) dollars for the purchase of the stock. When the chemical was used on the 20th, it proved successful, and on the 21st the companies began to run the oil. The evidence upon this question is conflicting, and we are unable to say the findings of the trial court are clearly against the weight of the evidence.

The plaintiff in error contends that there was a scheme, or conspiracy, between Mr. Shackleford and Mr. Dix to misrepresent the true condition of the companies in regard to the bills that were due and payable, and in having the bills presented to Mr. Dix on the lease in Mr. Wyatt's presence. It is further contended that the agent for the Treatolite had made very strong representations of a guarantee; that Treatolite would be a success in treating the oil; that the representations made by Dix to Mr. Wyatt were not as strong as the representations made by the agent, and Mr. Dix's only representation to Mr. Wyatt was that he had ordered the Treatolite, and, asked if he thought it would fix the oil, he said he did not know, but if it did not, it would not cost anything.

Upon whether the defendants made a full disclosure of the facts, the evidence is very conflicting; Mr. Wyatt stating certain facts, which were denied by Mr. Dix and Mr. Shackleford. If their story is true, they made a full disclosure of all the facts and circumstances regarding the financial conditions of the companies, and apparently the trial court has seen fit to believe Mr. Dix and Mr. Shackleford in place of Mr. Wyatt.

It is further contended that Mr. Dix also represented that he was not interested in any portion of the stock, and it now develops that he has an interest. He gave his explanation of how that came about, and ap-

parently the trial court accepted the same. We are unable to say, with the evidence conflicting as it is, that the finding of the trial court that the defendants made a true statement of the financial condition of the companies is clearly against the weight of the evidence.

The next contention of the plaintiff is that Mr. Wyatt was not advised of the sale of the eighty (80) acres of land. Mr. Shackleford testified that a man by the name of Bellisle had brought suit against Mr. Dix, Mr. Shackleford, and Mr. Wyatt for certain interests in the leases owned by the two corporations; that this suit was instituted in Okmulgee county, and the parties made a settlement with Mr. Bellisle and gave him something over six thousand ($6,000.00) dollars, and in making the settlement they borrowed the money from a bank at Clinton, Mo., and gave their note signed by Mr. Wyatt, Mr. Dix, and Mr. Shackleford, and the money obtained from the sale of this lease was used in paying this note, and the balance in paying the general expenses of the company. Mr. Shackleford stated this fact was known to Mr. Wyatt. The trial court certainly believed the statement of Mr. Shackleford, and we are unable to say the finding of the court upon that question is clearly against the weight of the evidence.

It is next contended that the interest of Mr. Wyatt was sold at a very inadequate consideration. As to the value of the property on the date of sale, or date of contract, which was the 14th day of February, 1917, the witnesses do not agree. The value is placed at anywhere from thirty-five thousand ($35,000.00) dollars to one hundred thousand ($100,000.00) dollars. All of the witnesses base their value upon certain facts, and admit there are many questions that go to determine the value of the property at that time. The value of the leases would depend a great deal upon the cause of the wells producing cut oil, whether it was the salt water and gas, or the cups; if it were the cups in the pump, this could be easily remedied; if the salt water and gas, it would depend upon being able to properly treat the oil to make it salable. The oil was properly treated and became salable, but no one knew, or, at least, the record discloses no one knew, whether this would be accomplished at the time of the sale. Again, it is difficult to tell exactly the consideration Mr. Wyatt was to have received. His part of the stock was about one-sixth of the total value of the property. He received four thousand ($4,000.00) dollars in cash. In addition to this, a note for over four thousand eight hundred ($4,800.00) dollars was given to his bank when the eighty (80) acres of

land was bought. This was the purchase price, and Mr. Shackleford and Mr. Dix and Mr. Wyatt each owed one-third. Mr. Shackleford was to pay all this note. This would make fifty-six hundred ($5,600.00) dollars. Mr. Dix was indebted to Mr. Wyatt's bank over ten thousand ($10,000.00) dollars, and Mr. Wyatt contended that he was liable to the bank for the payment of these notes. The contract provided that Mr. Shackleford should pay these obligations, and thus relieve Wyatt from any responsibility, all of which was done. Mr. Shackleford was to assume the indebtedness of the corporations. As to whether Mr. Wyatt was responsible for any of the debts of the corporations, it will not be necessary to determine. It does appear that he had twenty-five hundred (2,500) shares of the capital stock of the Sinai Oil & Gas Company, and had never paid anything for the same, and this was transferred to Shackleford. The Sinai Oil & Gas Company owed part of the eighteen thousand ($18,000.00) dollars indebtedness, and it is contended Mr. Wyatt would have been liable to the creditors for the purchase of the stock if the company had failed. It will be unnecessary to determine this question; but he was released from all of the obligations.

With the estimate of the value of the property ranging from thirty-five thousand ($35,000.00) to one hundred thousand ($100,000.00) dollars, and a finding that there was no fraud or misrepresentation, the price received does not seem such as would shock the conscience of the court.

We have not attempted to set out all of the evidence, and it would be impossible to do so, as the record contains approximately 1,000 pages. The case is one of purely equitable cognizance and one where the evidence is very conflicting. In order for the court to reverse the decision of the lower court it would be necessary to say the finding of the lower court is clearly against the weight of the evidence, and this we are unable to do.

For the reason stated, the judgment of the trial court is affirmed.

RAINEY, C. J., and KANE, PITCHFORD, JOHNSON, HIGGINS, and BAILEY, JJ., concur.